LAW OFFICE OF MALLISON & MARTINEZ
STAN S. MALLISON (admitted *Pro Hac Vice*)
HECTOR R. MARTINEZ (admitted *Pro Hac Vice*)
1042 Brown Ave., Suite A
Lafayette, CA 94549
Telephone: 925/283-3842
Facsimile: 925/283-3426

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK (admitted *Pro Hac Vice*)
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Co-Lead Counsel for Plaintiffs

KLEEBLATT, GALLER, ABRAMSON
 & ZAKIM LLC
RICHARD P. GALLER
IAN S. KLEEBLATT
25 Main Street
Hackensack, NJ 07601
Telephone: 201/342-1800
Facsimile: 201/342-1848

Liaison Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE RHODIA INC.<br>ERISA LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | ) Case No. MDL 1714 (DAB)<br>)<br>) CLASS ACTION<br>)<br>) CONSOLIDATED COMPLAINT FOR<br>) BREACH OF FIDUCIARY DUTY<br>)<br>)<br>) |

## INTRODUCTION

1. This is a class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(2) & (3), brought on behalf of the Plaintiffs Pam Skeeter, Jose Jimenez and a class of the participants and beneficiaries of the Rhodia Inc. Savings Plus Plan (the "Plan" or "Rhodia Savings Plan"), to remedy defendants' breaches of fiduciary duty under ERISA. The Plan is a retirement plan administered and sponsored by Rhodia Inc. ("Rhodia" or the "Company"), and administered by certain officers of the Company, the Company's Employees' Benefit Committee, the Plan's trustee and the Company's Board of Directors (collectively, the "defendants"). This civil enforcement action seeks relief on behalf of the Plan and all participants and beneficiaries of the Plan, and the individual Plaintiffs.

2. Defendants are entities and persons who are or which are fiduciaries with respect to the Plan, who or which acted in a fiduciary capacity, or who or which assumed a fiduciary role in relation to the Plan. During the Class Period, as defined herein, the defendants breached their fiduciary duties of loyalty and prudence to the Plan and their participants by, among other things, maintaining concentrated investments in Company stock that was imprudent and exposing the Plan to unreasonable risk of loss and injury, failing to monitor the prudence of Plan investments, and failing to monitor those to whom fiduciary duties had been delegated.

3. The defendants had a duty to provide complete and accurate information regarding Plan investments, including company stock. Defendants failed to provide plaintiffs and Class members with adequate information about the Company's true financial condition and prospects despite offering the Company's stock as a savings plan investment. Defendants offer and contribute Company stock to plaintiffs, current employees and Class members as a prudent savings plan investment. As a result of defendants' failure to disclose the material adverse condition of the Company, plaintiffs and Class members were misled and deprived of their

1

opportunity to make informed judgments as to their investments in Rhodia stock. Had plaintiffs and Class members been properly and adequately informed about: (a) the true financial condition of the Company; (b) the myriad of risks associated with investing in Company stock; and (c) Rhodia's current and future prospects, they would not have invested their retirement monies in Rhodia common stock or maintained significant investments in Rhodia common stock in the Plan and they would not have sustained the losses they ultimately endured.

4.      Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure of behalf of themselves, a class of all persons similarly situated and on behalf of the Plan. Defendants are entities and persons acting in a fiduciary capacity or who assumed a fiduciary role in relation to the Plan.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to ERISA, 29 U.S.C. §1132(e)(1), which grants to United States District Courts jurisdiction over claims of this type.

6.      This Court has personal jurisdiction over defendants because, as required by ERISA, 29 U.S.C. §1132(e)(2), one or more of the defendants may be found in this District. The Court also has personal jurisdiction over defendants because the Company's principal North American executive offices are in Cranbury, New Jersey. Defendants systematically and continuously do business in this state and the case arises out of defendants' acts within this state.

7.      Venue is proper pursuant to ERISA, 29 U.S.C. §1132(e)(2), because defendants administer the Plan in this District, some or all of the actionable conduct for which relief is sought occurred in this District and one or more of the defendants may be found in this District.

2

## THE PARTIES

8.     Plaintiff Pam Skeeter is a resident of the State of Texas. Ms. Skeeter is a participant in the Plan within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Ms. Skeeter suffered losses in her 401(k) account as a result of defendants' breaches of fiduciary duty.

9.     Plaintiff Jose Jimenez is a resident of the State of California. Mr. Jimenez is a participant in the Plan within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Mr. Jimenez suffered losses in his 401(k) account as a result of defendants' breaches of fiduciary duty.

10.     Defendant Rhodia is a French Company with its North American headquarters and principal place of business at 259 Prospect Plains Road, Cranbury, NJ 08512-7500. Rhodia describes itself as a chemical manufacturing company. Rhodia's ADR shares traded on the New York Stock Exchange under the symbol "RHA."

11.     Rhodia is the Plan's Sponsor and Plan Administrator as defined by ERISA, and on information and belief, has at all times acted in regard to the Plan in a fiduciary capacity in exercising authority or control respecting the management or disposition of the Plan's assets in accordance with ERISA, 29 U.S.C. §1002(21), in its own name and acting through its agents including, but not limited to, its executive officers, members of the Board of Directors, and the Company's Employees' Benefit Committee. In particular but without limitation:

(a)     Rhodia at all times exercised discretion as to whether to make matching employer contributions into the Plan, described below, in cash or in stock, and discretion as to whether to direct the trustees to sell stock for investment by the Plan;

(b)     Rhodia, as the Plan's Sponsor, both established the range of investments available to the Plan's participants and had a fiduciary duty to review the performance and suitability of investment options;

3

(c) Rhodia imposed restrictions on the sale of shares held in the Rhodia Common Stock Fund and failed to lift those restrictions when it would have been prudent to so do, which had the effect of depriving plaintiffs and Class members of the opportunity to exercise control over their Plan's assets and/or forced them to concentrate their Plan's assets in Rhodia stock; and

(d) On information and belief and in anticipation of further discovery, Rhodia communicated information concerning the actual and projected financial condition and performance of the Company and the value of Rhodia stock directly to participants for the purpose of affecting their decisions concerning whether or not to buy or sell Rhodia stock, and exerted undue influence through its agents and directors upon the actions both of named fiduciaries and plan participants in regard to their decisions whether or not to direct the trustee to invest the Plan's assets in the Rhodia Stock Fund.

12.     Rhodia was responsible for the appointment and ongoing monitoring and review of the performance of the trustee and the Plan's fiduciaries.

13.     Defendant Fidelity Management Trust Company ("Fidelity") served as asset custodian and the Trustee of the Plan from January 1, 2001 until present. Fidelity's offices are located at 82 Devonshire Street, Boston, MA 02109-4038. Fidelity was fiduciary of the Plan within the meaning of ERISA in that it exercised authority and control over the management or disposition of the Plan's assets, in particular, but not limited to, determining whether to purchase and hold shares in the Rhodia Stock Fund. On information and belief and in anticipation of further discovery, plaintiffs allege Fidelity was responsible for evaluating the performance of all Plan funds, including the Rhodia Stock Fund, and it is and was responsible for communicating investment information and advice to Plan participants through regular account statements and

4

investment newsletters, through which it gave and gives investment advice to participants and beneficiaries. Upon information and belief and in anticipation of future discovery, Fidelity also acted at all times relevant hereto as an advisor to other fiduciaries on matters concerning the disposition and control of Plan assets.

14. Defendant Jean-Pierre Tirouflet ("Tirouflet") was, until 2003, Chairman, and until January 1, 2003, Chief Executive Officer of Rhodia. Because of Tirouflet's positions, he knew the adverse non-public information about the business of Rhodia as well as its finances, markets and present and future business prospects via access to internal corporate documents (including Rhodia's operating plan, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and via reports and other information provided to him connection therewith. Tirouflet was responsible for, among other things, reviewing the Company's financial affairs, including its capital structure, borrowing limits, financing of corporate acquisitions and the performance of its benefit plan and overseeing the financial reporting process. During the Class Period, Tirouflet participated in the issuance of false and/or misleading statements to employees and the public. On information and belief, he acted in that capacity to exercise discretionary authority or control respecting management of the Plan and authority or control respecting management or disposition of its assets and as a fiduciary with respect to the Plan under the terms of ERISA.

15. Defendant Gilles Auffret ("Auffret") is the Company's Chief Operating Officer, and has been Group Executive Vice President of the Company since 2003. Because of Auffret's position, he knew the adverse non-public information about the business prospects of Rhodia, as well as its finances, markets and present and future business prospects via access to internal

5

corporation documents (including Rhodia's operating plan, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, Auffret participated in the issuance of false and/or misleading statements, including the preparation and/or review of false and/or misleading press releases and SEC filings. Auffret was responsible for, among other things, reviewing the Company's financial affairs, including its capital structure, borrowing limits, financing of corporate acquisitions and the performance of its benefit plan and overseeing the financial reporting process. On information and belief, he has acted in that capacity to exercise discretionary authority or control respecting management of the Plan and authority or control respecting management or disposition of its assets and as a fiduciary with respect to the Plan under the terms of ERISA.

16. Defendant Diana Audette ("Audette") served at times relevant hereto as the Company's Employee Benefits Officer, Head of Human Resources, and a member of the Investment Board. On information and belief, in this capacity, Audette has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

17. Defendant John Donahue ("Donahue") served at times relevant hereto as Vice President and General Counsel, Corporate Secretary, and Investment Board Member. In these capacities, Donahue has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

6

18. Defendant Pierre Prot ("Prot") was Senior Vice President and Chief Financial Officer of the Company. Because of Prot's position he knew the adverse non-public information about the business of Rhodia as well as its finances, markets and present and future business prospect via access to internal corporate documents (including Rhodia's operating plan, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, Prot participated in the issuance of false and/or misleading statements to the public and to employees.

19. Defendant Guy McCormick ("McCormick") served at times relevant hereto as a controller of the Company. Because of McCormick's position he knew the adverse non-public information about the business of Rhodia as well as its finances, markets and present and future business prospect via access to internal corporate documents (including Rhodia's operating plan, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, McCormick participated in the issuance of false and/or misleading statements to the public and to employees. At times relevant hereto, McCormick was directly responsible for reviewing the Company's executive compensation and employee benefit plan and programs, including their establishment, modification and administration. In these capacities, McCormick has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

7

20. Defendant Jean-Pierre Clamadieu ("Clamadieu") served at times relevant hereto as a Chief Executive Officer of the Company. In this capacity, Clamadieu has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

21. Defendant Cheryl Staton ("Staton") served at times relevant hereto as Chairman of Rhodia Alliance North America and is the signatory Plan Administrator on Rhodia's Savings Plan's Form 5500 for the plan year 2002 beginning January 1, 2002 and ending December 31, 2002. In these capacities, Staton has exercised discretionary authority or control with respect to the management of the Plan and authority or control respecting the disposition of its assets and is a fiduciary to the Plan under the terms of ERISA.

22. The defendants referenced above in paragraphs 14 through 21 are referred to herein as the "Individual Defendants." The Individual Defendants exercised discretionary authority respecting the Plan's management or administration within the meaning of ERISA, 29 U.S.C. §1002(21)(A) by undertaking to perform the duties of the Administrator as set forth in the Plan. In addition, the Individual Defendants acted in a fiduciary capacity by making decisions relating to the management of and investment of plan assets, or by delegating the authority to manage or invest plan assets to a committee or committees.

23. Defendant Benefits Committee Rhodia Inc. ("Benefits Committee") is the "Plan Administrator" as that term is defined by ERISA. Subject to such general rules and regulations as the Investment Committee may promulgate from time to time, the Benefits Committee has responsibility for the administration of the Plan pursuant to the terms of the Plan and the Trust Agreement, which governs the operation of the Plan. The Benefits Committee was appointed by

8

the Board of Directors for the purposes of plan administration. Upon information and belief, and in anticipation of future discovery, the Benefits Committee was responsible for, among other things, determining the investment alternatives available for investment pursuant to the provisions of the Plan. The Benefits Committee was responsible for monitoring the prudence of the investment alternatives offered by the Plan, including the Company Stock Fund. Plaintiffs allege, upon information and belief and in anticipation of further discovery, that the Benefits Committee also had, or assumed, discretionary authority to change investment options within the Plan. The Employee Benefit Committee had delegated authority by the Board of Directors to interpret the Plan, construe the application of the terms of the Plan, or to determine any matter relating the Plan.

24. Defendants The Investment Committee of Rhodia's Board of Directors ("Investment Committee") oversees the administration of the Plan. The Investment Committee is specifically empowered under the Rhodia Savings Plan from "time to time" to promulgate general rules and regulations which governed the Benefits Committee's actions.

25. In discharging their assigned duties under the Plan, the Plan Administrator and each other named fiduciary under the Plan have the absolute and exclusive authority to interpret the terms of the Plan, including the Plan's eligibility provisions and its provisions relating to qualification for an accrual of benefits; to adopt, amend and rescind rules and regulations pertaining to its duties under the Plan; and to make all other determinations necessary or advisable for the discharge of its duties under the Plan, provided such authority is exercised in a uniform and non-discriminatory manner. Decisions of the Plan Administrator and each other named fiduciary are binding on all persons seeking Plan benefits.

9

26. The Individual Defendants assigned or attempted to assign responsibility for complying with fiduciary responsibilities to selected agents, including the Employee Benefit Committee, or other committees and employees, and upon information and belief, to Fidelity. By such authority, the defendants exercised control over the Plan, or, alternatively deprived their agents of the capacity to exercise fiduciary duties independently. By these and other actions, the individual directors constituted themselves as fiduciaries as set forth in ERISA, 29 U.S.C. §1002(21)(A).

27. On information and belief and in anticipation of further discovery, defendants Rhodia and the Individual Defendants exercised discretionary authority respecting the Plan's management and/or administration within the meaning of ERISA, 29 U.S.C. §1002(21)(A), particularly in light of the alleged status of the Plan under ERISA §404(c), 29 U.S.C. §1104(c), and its regulations, and are or were during relevant times, fiduciaries of the Plan based on actions alleged herein. These actions included, but were not limited to, the discretionary authority to appoint or remove investment managers, selection of investment options, to allocate assets and contributions, appoint or remove administrative managers, and generally to operate the Plan. To the extent that any of the defendant fiduciaries attempted to delegate their fiduciary authority, they retained a duty to monitor the performance of those to whom the duty was delegated. In addition, some or all of the defendants caused the issuance of communications directed to the Plan's participants concerning the revenue, earnings and financial condition of the Company which affected present or potential assets or investments of the Plan and decisions of the participants relevant thereto.

28. Because of the defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends,

10

financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. By virtue of this information, the defendants knew, or should have known, that information being disseminated to the Plan participants (by virtue of statements to the public) regarding the status of the company, and thereby the status of the Plan investment alternatives, was inaccurate or misleading. True and accurate information regarding the Company would have revealed that the plan assets invested in the Company Stock Fund were at serious risk of loss. The defendants, as fiduciaries with respect to the Plan, had a duty not to materially mislead plan participants, a duty to correct misleading information disseminated regarding Plan assets, a duty to disclose information to allow other fiduciaries or participants to take timely action to protect plan assets, and a duty to act to protect Plan assets.

## THE RHODIA RETIREMENT SAVINGS PLAN

29.     The Rhodia Savings Plan is a defined contribution plan covering approximately 4516 employees or ex-employees of the Company and its subsidiaries.

30.     At all relevant times, the Plan was and continues to be a "defined contribution plan" within the meaning of ERISA, 29 U.S.C. §1002(34), and "eligible individual account plan" within the meaning of ERISA, 29 U.S.C. §1107(d)(3). Further, the Plan was and continues to be qualified cash or deferred arrangements within the meaning of the Internal Revenue Code §401(k), 29 U.S.C. §401(k).

11

31.     As evidenced by the provisions of the Summary Plan Description, the Plan was intended to be a long-term investment, that is, "The Savings Plus Plan helps you save for your retirement."

32.     At all relevant times, Rhodia was the Plan's sponsor.

33.     At all relevant times, defendants acted as fiduciaries of the Plan pursuant to ERISA, 29 U.S.C. §1002(21)(A). Defendants exercised discretionary authority or control over the management or administration of the Plan or control in the management or disposition of the Plan's assets.

34.     The Plan is administered, in part, by the Company's Benefits Committee. The Benefits Committee has the responsibility for managing the Rhodia stock fund and for selecting the investment funds available for employee directed investments. Certain administrative and discretionary functions are also performed by Fidelity, the directors, officers or employees of the Company or its subsidiaries.

35.     The Plan authorizes a participant who has been credited with at least one year of eligible service to make a pre-tax and/or after-tax contribution of not more than 18% of the participant's base pay in whole percentages. The maximum annual contribution to the Plan by participants for 2003 was $12,000. The Company matches 100% of an employee's "basic contributions" – saving on the first 4% of base. The first 25% of company matching contributions for a month are invested in the "Rhodia Stock Fund" and are referred to as restricted matching contributions. The remaining 75% of company matching contributions for that month can be invested in any of the investment options provided by the plan and are considered "unrestricted matching contributions." Participants are prevented from transferring any of the matching contributions from the Rhodia Stock Fund prior to the maturity date which is

12

defined as the "January 1st coincident with or immediately preceding the fourth anniversary of such contribution."

36.    The trustee of the Plan holds the investments of the Plan in trust on behalf of the participants and beneficiaries.

37.    Throughout the Class Period, participants could elect to have their contributions invested in sixteen funds including the Rhodia Stock Fund, which consists of "under normal circumstances, primarily in the stock of Rhodia as well as short-term investments." Company matching contributions, however, were only invested in the Rhodia Stock Fund.

38.    Throughout the Class Period defendants represented to investors and employees that Rhodia's business was strong; that the Company was successfully achieving strong financial results and executing on its business plan; and that the Company's goodwill valuation, assets and other liabilities were properly and reasonably valued. In its quarterly SEC filings and in news releases, the Company reported misleadingly favorable financial results based upon the company's failure to follow proper accounting procedures.

39.    Defendants hid Rhodia's financial state of affairs by inflating earnings by failing to properly account for its goodwill, assets and liabilities even after it became apparent to defendants—but not to the investing public—that these assets were impaired or the liabilities were understated.

## BACKGROUND TO THE CLASS PERIOD

40.    Rhodia was formed in 1998 through a series of transactions carried out by Rhone-Poulenc and several of its subsidiaries. Rhone-Poulenc transferred to Rhodia: (i) its directly and indirectly held equity interest in the other subsidiaries, partnerships and businesses that made up the Chemicals and Fibers and Polymers segments of Rhone-Poulenc; and (ii) substantially all other assets and liabilities related to its chemicals, fibers and polymers businesses that were

13

historically recorded under segments of Rhone-Poulenc other than the Chemicals and Fibers and Polymers segments. Rhodia became a public company on June 23, 1998, when Rhone-Poulenc sold 33% of its stake in the Rhodia Group to the public.

41.    In September 2000, Rhodia acquired ChiRex, a U.S. company specializing in providing high technology services to the pharmaceutical industry, through a friendly takeover. In addition, Rhodia contributed its own pharmaceutical custom manufacturing activities to ChiRex, creating a new company called Rhodia ChiRex.

42.    It was important to Rhodia to be perceived favorably and to minimize the risks associated with its liquidity so that it could raise the necessary financing to fund its business. Thus, defendants concealed the deteriorating nature of Rhodia's ChiRex acquisition.

43.    At the beginning of the Class Period, Rhodia's shares were trading at above $12 per share.

## THE FALSE AND MISLEADING STATEMENTS

44.    On April 26, 2001, Rhodia issued its 1Q:01 results in a release which stated in part:

For the first quarter of 2001, Rhodia announced net sales of €1,979 million, an increase of 28% over the same period in 2000. On a comparable basis (constant structure and exchange rates), net sales increased by 4.3%; the Group was able to increase its prices by 3% and volumes by 1.3%.

During the first three months of the year, Earnings Before Interest, Tax, Depreciation and Amortization EBITDA increased slightly (+ 1.3%) compared to last year, to €240 million.

45.    On June 27, 2001, Rhodia filed its Form 20-F with the SEC, which contained the financial statements for the year ended December 31, 2000, which stated in part:

Unless otherwise indicated, the financial information contained in this annual report· has been prepared in accordance with French generally accepted accounting principles (GAAP), which differ in certain significant respects from U.S. GAAP. See Note 29 to our audited consolidated financial statements for the

14

years ended December 31, 2000, 1999 and 1998 (together with the notes thereto, the "Financial Statements") included elsewhere in this annual report for a description of the principal differences between French GAAP and U.S. GAAP, as they relate to Rhodia and its consolidated subsidiaries, and for a reconciliation to U.S. GAAP of net income.

\* \* \*

With net sales of €7.4 billion for 2000, Rhodia is one of the world's largest specialty chemicals companies. Rhodia has leading worldwide market positions in many of its major businesses, ranking number one on the basis of 2000 net sales in products such as food phosphates, vanillin, guar gum, acetyl-salicylic acid, mild surfactants, technical fibers, microfibers, high precision monofilaments and highly dispersible silica, and in services such as sulfuric acid regeneration and separated rare earths. Rhodia is the second largest producer in the world of polyamide, food cultures, xanthan gum and paracetamol. Rhodia has developed strong customer relationships throughout the world in a broad range of industries, including consumer goods such as health, beauty and food products; industrial applications, such as electronics, paper and packaging; chemicals; housing and construction materials, life sciences; high technology services to the pharmaceutical industry; automobile and transport; and environmental protection.

46.     On July 26, 2001, Rhodia issued a press release entitled "Rhodia Intensifies

Restructuring Efforts Projecting Charges of 150 Million Euros." The press release stated in part:

Rhodia announced net sales of €\$3,906 million for the first half of 2001, up 12% compared with the first half of 2000. On a comparable basis (constant structure and exchange rates), net sales increased by 2.8% with volumes declining 1.2% while prices increased by 4%, demonstrating the Group's ability to increase pricing during difficult economic conditions.

\* \* \*

"In the face of the continuing difficult economic conditions that have strongly hurt our first-half 2001 results, we have decided to react vigorously: the restructuring programs that we had planned to carry out over the next three years will be accelerated and completed in 2002; capital spending in 2002 will be reduced to a level 20% below that of 2000; Corporate expenses will be cut by 30% in 2003 from this year's levels," said Jean-Pierre Tirouflet, Chairman and Chief Executive Officer of Rhodia.

47.     On October 25, 2001, Rhodia issued its 3Q:01 results in a press release which

stated in part:

Rhodia, one of the world's leaders in specialty chemicals, today published its financial results for the nine months through September 30, 2001. Highlights include:

-- Net income: -€56 million (+€62 million excluding non-recurring items).

-- Net sales up 3.5% despite a sharp decline in market conditions.

-- Group profitability impacted primarily by the Polyamide Division.

-- EBITDA: -26% (-17% excluding non-recurring items) due to the combined effect of a downturn in business activity, the high price of raw materials and restructuring costs.

-- Acceleration of the restructuring program.

-- Corrective measures taken to bring production capacity into line with the economic downturn.

48. Tirouflet, Chairman and Chief Executive Officer of Rhodia, stated: "The current business environment is obviously difficult; Rhodia is responding quickly and strongly. Certainly, the 2001 results will be penalized by our accelerated restructuring programs, but we will nevertheless be generating positive free cash flow during the second half of the year. The actions underway will have a positive impact on our results as early as the beginning of next year. Due to our efforts and strategy since 1998, a third of our businesses are the most profitable worldwide in their sector. Rhodia's teams are actively working to achieve the same result throughout the Group. That is our commitment."

49. On January 29, 2002, Rhodia issued its 4Q:01 and FY:01 results in a press release which stated in part:

Rhodia today published its annual results for 2001. The principal highlights are as follows:

### Analysis of 2001 results

-- A marginal decline in Net Sales (- 1.9%) to €7,279 million, in an extremely depressed business environment.

16

--      Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) of €633 million, a decrease of 38% under the combined pressure of restructuring costs, high raw material costs and the downturn in business activity (down 22% excluding non-recurring items).

--      Positive recurrent Net Income of €69 million, translating to a reported loss of €213 million due to a €409 million charge for non-recurring items (before tax), of which €253 million was allocated for restructuring.

--      Corporate debt reduced €494 million due to a positive cash flow of €193 million and the disposal of assets.

### Outlook for 2002

--      A clear growth in profitability (through the automatic effect of nearly €400 million on Operating Income).

--      Capital expenditure limited to €400 million, in line with the Group's growth strategy.

--      Debt reduced by at least €500 million mainly due to an asset disposal program.

50.     On April 29, 2002, Rhodia issued its 1Q:02 results in a press release which stated

in part:

Rhodia today published its results for the first quarter of 2002. Highlights for the first three months and the main points of comparison with the fourth quarter of 2001 are as [sic]:

--      Slight improvement in business activities compared with the fourth quarter of 2001 in what continues to be a depressed economic environment

--      Growth in EBITDA and in Operating Income.

--      Implementation of the Group's divestment program: announced [sic] of the sales of paper latex production and hazardous industrial waste treatment activities.

51.     On July 25, 2002, Rhodia issued its 2Q:02 results in a press release which stated

in part:                              .

        Rhodia reported second quarter 2002 net sales of 1,774  million euros, a decline of 8% compared to the same period last year. On a comparable basis (constant structure and exchange rates), net sales decreased 4.1% with a price

effect of $-1.4\%$ and a volume effect of $-2.7\%$. Net sales for the second quarter of 2002 increased 3.7% compared with the first quarter of 2002 with slightly higher volumes in a difficult economic environment.

-- Another improved quarter for operating results.

EBITDA for the second quarter of 2002 improved by 5.6% to 227 million euros compared to the same period last year. The Group benefited from an improvement in its product mix and was able to resist pricing pressure. Additionally, the ratio of EBITDA /Sales improved to 12.8% versus 11.1% for the second quarter of 2001.

52.     On October 28, 2002, Rhodia issued its 3Q:02 results in a press release which

stated in part:

For the third quarter of 2002, Rhodia generated net sales of €1,604 million, representing a decline of 4.8% compared with the same period last year. On a comparable basis (constant structure and exchange rates), net sales increased by 4.2% with a price effect of - 3.1% and a volume effect of + 7.3%.

The seasonal downturn in sales usually observed at this time of the year led to a decline in volumes during the third quarter (on a comparable basis) while prices remained stable compared with the second quarter of 2002.

-- Operating margin up 2.6 points compared with the third quarter of 2001 on a recurring basis

Compared with the third quarter of 2001, Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) rose 22.7% (on a recurring basis) to reach a total of €184 million. The Group benefited from an improvement in its product mix and was able to resist downward pressure on its selling prices. As a result, the EBITDA/Sales ratio, at 11.5%, is 2.6 points higher than it was at the end of the third quarter of 2001 (8.9%).

53.     On February 5, 2003, Rhodia issued a press release entitled "Rhodia Reaches Its

Principal 2002 Objectives and Maintains the Same Dividend Level." The press release stated in

part:

The Group achieved its key commitments made at the end of 2001: a gradual return to profitability, the completion of a significant asset divestiture program and the generation of positive operating cash flow.

IMPROVED OPERATING PROFITABILITY

--      Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) up 26.1%, reaching a total of 798 million euros against 633 million euros reported in 2001.

--      Improvement in Operating Income to 351 million euros in 2002 against 91 million euros in 2001 on an historic basis.

--      EBITDA/Sales ratio of 12.1%, representing a 3.4 point increase over 2001.

500 MILLION TARGET FROM ASSET DIVESTMENTS EXCEEDED

--      Financial debt reduced by 516 million euros through divestments.

--      Average valuation of divestitures 5.5 times greater than EBITDA.

--      Overall capital loss of 37 million euros.

GENERATION OF 132 MILLION EUROS IN POSITIVE FREE CASH FLOW

--      Positive operating cash flow of 277 million euros, despite 152 million euros in outlays related to the restructuring program financed in 2002.

--      Free cash flow of 132 million euros impacted by the exceptional payment of 145 million euros into British and American pension funds.

--      Capital expenditures reduced almost 110 million euros (374 million euros in 2002 compared with 483 million euros in 2001).

54.     On April 29, 2003, Rhodia issued its 1Q:03 results in a press release which stated

in part:

In a difficult economic and geopolitical environment, the results for the first quarter - which seems to represent a trough in the business cycle - correspond to the estimates published on April 7, 2003. The highlights of the period are as follows:

--      Growth in net sales, on a comparable basis of structure and exchange rates

--      Group performance affected by the rise in the value of the euro and higher raw material prices

--      Positive operating income

--      Negative net income, also impacted by an unfavorable tax effect

19

\* \* \*

Outlook

In a still uncertain economic and geopolitical environment, the second quarter should see an improvement compared with the first quarter of the year, despite the persistently high cost of petrochemical raw materials.

Rhodia appears to have now reached a turning point in its performance as far as its margins are concerned. The recovery of our selling prices noted at the end of the period, combined with the beginning of a gradual decline in raw material costs following the fall in oil prices observed since the end of March, should enable the Group to improve its margins slightly during the second quarter, followed by a more substantial recovery during the second half of the year.

Rhodia maintains its target for the end of 2003, to reduce its Net Debt/EBITDA ratio to less than 2.5 through, particularly, the pursuit of its restructuring drive, the launch of sixty new products this year, its ability to generate free cash flow and the continuation of its program of divesting non-strategic assets.

55.     On July 25, 2003, Rhodia issued its 2Q:03 results in a press release which stated

in part:

Rhodia reported net sales of €1,407 million for the second quarter of 2003, slightly lower than the first quarter, in what remains a particularly depressed economic environment affected by extremely low volumes and persistently high raw material prices. Compared with the second quarter of 2002, on the same basis (constant structure and exchange rates), net sales declined by 0.9%, with a price effect of 2.4% and a volume effect of –3.3%. Net sales declined by 20.6% compared with the reported second quarter 2002 results.

All Divisions followed the same general trend to a greater or lesser extent, while all end markets served by Rhodia remained weak during the period. Despite reduced demand and the sluggishness of end markets, the Group still was able to pass on higher prices to its customers.

The Group also continued to reduce its fixed costs, generating savings of €38 million during the quarter due, in particular, to programs to reduce operating expenses of Enterprises and Support Functions and to the restructuring program launched at the end of 2001.

Contrary to predictions made in March, the continued firmness of raw material prices driven by the persistently high price of oil during the second

20

quarter, following the war in Iraq, had a negative impact on the Group's overall performance. However, in spite of largely unfavorable foreign exchange effects, the savings achieved on fixed costs and the Group's ability to pass on higher prices to its customers enabled Rhodia to deliver EBITDA of €123 million, equal to growth of 9.8% compared with the first quarter. Compared with the reported second quarter 2002 results, EBITDA declined by 45.8%.

56. In early October 2003, Rhodia shares fell 7.5%, trading at their lowest level since the Company went public in June 1998, after analysts cut their ratings and price targets. This was after the Company reported that 3Q:03 earnings before interest, tax, depreciation and amortization dropped to between €70 million and €80 million, from €149 million in the year-earlier quarter, and that it did not expect market conditions to improve significantly in 4Q:03.

57. On October 30, 2003, Rhodia reported its 3Q:03 results in a release which stated in part:

Rhodia reported net sales of 1,299 million euros for the third quarter of 2003, a total 7.7% lower than the second quarter of 2003. Already suffering from the negative impact of persistently high petrochemical commodities prices and the continued weakness of the US dollar against the euro, the Group also faced a sharp reduction in demand during the summer period far exceeding the normal seasonal effect for the quarter. Compared with the third quarter of 2002 on the same basis (constant structure and exchange rates), the lower net sales figure for the third quarter of 2003 is exclusively due to the decline in volumes (down 4.6%); under these conditions, price levels remained stable. Compared with the reported figures for the third quarter of 2002, net sales fell by 19%.

\* \* \*

Rhodia also had restructuring charges of approximately 14 million euros in the third quarter with a negative impact on Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA), which stood at 75 million euros, down almost 39% compared with the second quarter of 2003. Compared with the third quarter of 2002 on the same basis (constant structure and exchange rates), EBITDA declined by 49%.

\* \* \*

-- NET DEBT

21

The Group's net financial debt remains stable compared with the end of December 2002, at 2,132 million euros. The Group recorded negative free cash flow of 120 million euros in the third quarter due particularly to depressed EBITDA and a marginal deterioration in working capital. The stable net debt position is due to the 75 million euros generated from asset divestitures in the third quarter and the reimbursement of a shareholders' advance from the Butachimie joint venture. Capital expenditure is also in line with the strict spending limits adopted by the Group for 2003.

--    OCTOBER 3/OCTOBER 30, 2003: RHODIA PREPARES FOR ACTION

--    Consolidation of financing requirements

Rhodia is in advanced negotiations with its banks with a view to finalizing an agreement in principle setting the framework for the consolidation of the Group's medium-term financial resources.

This agreement in principle provides for an arrangement with respect to the Group's existing banking lines, including the adjustment of covenants for December 31, 2003, as well as a new medium-term credit facility aimed at replacing the Group's existing banking lines.

--    Streamlining and simplification of the Group's structures

The senior management team has defined the overall architecture of a plan to simplify and streamline the organization of the Group.

The following has already been decided:

--    Reduce the number of Enterprises from 17 to 9, with direct supervision by the Chief Executive Officer and the Group Executive Vice-President.

--    Reduce the cost of corporate structures by 50% by the end of 2004.

--    Organize support functions into "platforms."

This plan will produce savings of approximately 120 million euros by 2005, with a full-year effect of 165 million euros in 2006.

Additionally, industrial rationalization is confirmed, aimed at ultimately reducing or optimizing the number of production facilities to achieve savings of 35 million euros per year by 2005 and 80 million euros in cumulative savings by 2006.

--    Refocusing of the business portfolio

22

Rhodia confirms its decision to refocus its portfolio of strategic businesses to accelerate debt reduction in a way that is consistent with its medium-term strategy. The Group has already identified a number of activities that could potentially be sold, with a total estimated value of approximately 1.3 billion euros. This basket approach will enable the Group to select only those businesses attracting the highest valuations enabling it to reach its targeted disposal proceeds of 700 million euros by the end of 2004.

58.     In early December 2003, Rhodia shares fell 16% to a five-year low after the

*Financial Times* said France's largest specialty chemical maker was under pressure from

creditors to sell €300 million worth of shares to existing investors at a discount.

59.     On February 13, 2004, Rhodia issued a press release entitled "Sharp Deterioration

in 2003 Results; First Steps Achieved in Group's Recovery Plan." The press release stated in

part:

Rhodia reported Net Sales of 5,453 million euros in 2003, down 17.6% compared with 2002. The decline is due primarily to changes in the Group's structure (-8.8%) following divestitures in 2002 and 2003 and foreign exchange rate effects (-7.8%) caused by the persistent weakness of the US dollar.

On the same basis (constant structure and exchange rates), net sales declined 1.2% compared with 2002 due to decreased volumes, particularly in the pharmaceuticals, agrochemicals and textiles markets. In an adverse business environment, price levels remained stable.

60.     Ultimately, on March 23, 2004, it was revealed that French securities regulators

were conducting an inquiry into the Company's financial reporting.

61.     In response to these revelations and investigations into the Company's prior

accounting, the Company's ADRs plummeted another 10% from $3.01 to $2.74. The Company's

ADRs later dropped to below $1.50 per share.

## UNDISCLOSED ADVERSE INFORMATION

62.     Rhodia's actual financial results and the true status of its operations were

concealed by defendants, which operated to artificially inflate or maintain the market price of

23

Rhodia securities during the Class Period. Each of the releases, SEC filings and statements particularized herein was false and misleading and misrepresented and/or failed to disclose the following material adverse information:

    a.    Rhodia was carrying an overvalued asset on its books in the form of its ChiRex unit which was impaired and should have been written down in a timely fashion but was not;

    b.    Rhodia failed to write down its deferred tax assets to recoverable values in 2002 and failed to do so in 2003 until the end of the year;

    c.    The Company failed to properly report its outstanding debt; and

    d.    The Company failed to include disclosures to make it possible for investors to understand the trends in its business.

## RHODIA'S FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

63.    In order to inflate the price of Rhodia's securities, defendants caused the Company to falsely report its results during the Class Period through its failure to record timely and adequate reserves for its ChiRex unit, thereby materially overstating its net income and revenue and understating the Company's net liabilities in violation of International Accounting Standards and Generally Accepted Accounting Principles ("GAAP").

64.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim

24

financial statements need not include disclosure which would be duplicative of disclosures

accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

65.     Rhodia represented that its financial statements were reconciled to GAAP.

GAAP, as described by Statement of Concepts No. 5, states that an asset should be written down

when previously recognized benefits have been diminished or eliminated:

87.     An expense or loss is recognized if its becomes evident that previously
recognized future economic benefits of an asset have been reduced or eliminated,
or that a liability has been incurred or increased, without associated economic
benefits.

According to International Accounting Standards, impaired assets must be
recognized as an expense immediately. AC §9036.58-59 states in part:

.58     If, and only if, the recoverable amount of an asset is less than its carrying
amount, the carrying amount of the asset should be reduced to its recoverable
amount. That reduction is an impairment loss.

.59     An impairment loss should be recognized as an expense in the income
statement immediately, unless the asset is carried at revalued amount under
another International Accounting Standard (for example, under the allowed
alternative treatment in IAS 16, Property, Plant and Equipment [section 9016]).
Any impairment loss of a revalued asset should be treated as a revaluation
decrease under that other International Accounting Standard.

Due to these accounting improprieties, the Company presented its financial results and

statements in a manner which violated International Accounting Standards and GAAP.

66.     Further, the undisclosed adverse information concealed by defendants during the

Class Period is the type of information which, because of SEC regulations, regulations of the

national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors

to be the type of information which is expected to be and must be disclosed.

25

## RHODIA MANAGEMENT'S RESPONSIBILITY FOR
## AND KNOWING FAILURE TO IMPLEMENT AND MAINTAIN
## ADEQUATE INTERNAL ACCOUNTING CONTROLS

67. Rhodia had a responsibility to maintain sufficient accounting controls to accurately report its financial results. It is well settled that the representations made by a company in its financial statements and in other financial disclosures to the public are the representations of that company's management. Indeed, even when a company issues audited financial statements together with the report of that company's independent auditors, that report always expressly provides that "the financial statements are the responsibility of [the company's] management."

68. According to SEC rules, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a company must establish an internal control structure. Pursuant to §13(b)(2) of the Exchange Act, Rhodia was required to:

(a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(i) transactions are executed in accordance with management's general or specific authorization; [and]

(ii) transactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ....

69. Moreover, according to Appendix D to Statement on Auditing Standards No. 55 ("SAS 55"), "Consideration of the Internal Control Structure in a Financial Statement Audit," management should consider, among other things, such objectives as (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for

26

assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

70. As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records, and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements. In short, the larger the entity, the more the nature of the entity's business is complex, diverse and sophisticated, and the public ownership of the entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets (*e.g.*, comparing inventory as recorded on a company's books to those amounts actually "on hand") to eliminate any discrepancies between the recorded and actual amounts.

71. According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

72. Contrary to the requirements of SEC rules, Rhodia failed to implement and maintain an adequate internal accounting control system. Since the beginning of 2001, at the latest, Rhodia management knowingly tolerated the existence of inadequate internal controls and/or recklessly disregarded their obligation to implement adequate controls to ensure that the

27

results of operations were properly recorded in compliance with SEC rules, International Accounting Standards and GAAP.

73.     On information and belief and in anticipation of further discovery, some or all of the Individual Defendants, and some or all of the members of the Benefits Committee, were aware of the events and facts described above and failed either to initiate an investigation on behalf of the Plan on the nature of the accounting practices or to inform their fellow fiduciaries of this indication of possible irregularities. A loyal and prudent fiduciary would have initiated an independent investigation to evaluate whether Rhodia stock remained a prudent investment alternative for the Plan, and concluded that either diversification or even complete investiture was prudent at the time. On information and belief and in anticipation of further discovery, none of the defendants performed or initiated such an investigation, and the Rhodia Savings Plan remained an investment alternative in each Plan and employer matching contributions continued to be made in contributions to the Rhodia Stock Fund.

74.     On information and belief and in anticipation of further discovery, and due to those actions as alleged above, Plan shares were consistently traded at a price above fair market value, as that term is defined under ERISA and its governing regulations. The misrepresentations made by Rhodia and Individual Defendants in SEC filings were directly communicated to Plan participants as prospectuses, SPD documents and/or other Plan documents.

75.     Defendants knew or were under a fiduciary obligation to discover and disclose to plaintiffs and the Class that there were serious problems with Rhodia's ongoing financial situation prior to the middle of 2001 as detailed above, yet failed to do so.

28

76.   Prior to and throughout the Class Period, the defendants had a fiduciary duty to monitor the prudence of the various investment options offered by the Plan. Plaintiffs allege, upon information and belief, that the primary responsibility for monitoring the prudence of continued investment in each of the Investment Funds lay with the Individual Defendants. They, in turn, delegated, or attempted to delegate the monitoring of the Investment Funds to one or more committees including the Investment Committee and the Benefits Committee.

77.   Appropriate evaluations of the prudence or lack thereof of investment alternatives would have included the long term investment performance of the investment option, the risk versus reward of the option, the performance of the investment option as compared to objective benchmarks, and otherwise monitored the performance and suitability of the investment option for inclusion within the Plan. Investment options which were no longer prudent should have been removed from the Plan as investment alternatives.

78.   The Rhodia Stock Fund was one of the investment options offered pursuant to the provisions of the Plan. The defendants chose to invest all contributions to the Rhodia Stock Fund in Rhodia stock and a de minimus amount in cash and other short term instruments. Upon information and belief and in anticipation of further discovery, the Rhodia Stock Fund was not reviewed or evaluated by any defendant to determine whether it remained a prudent investment for participant contributions.

79.   Prior to and throughout the Class Period, Rhodia stock exhibited volatile swings in its value and failed to provide a fair return commensurate with the prevailing rate of returns on comparable investments. Had the defendants investigated the reasonableness of Rhodia stock as an investment option, a reasonable fiduciary would have known that Rhodia stock, and therefore the Company Stock Fund, was not a reasonably prudent investment for the Plan.

29

80. By failing to investigate properly or to monitor the prudence or otherwise of the Rhodia Stock Fund as an investment alternative, the Individual Defendants breached their fiduciary duty, and plaintiffs and the Plan were harmed. By maintaining the Company Shares Fund as an investment alternative and by continuing to make regular contributions to the Rhodia Stock Fund through employer matching contributions, the Defendants abused their discretion, and plaintiffs and the Plan were harmed.

81. Throughout the Class Period, defendants continued to advise, offer, issue, direct and engage in the purchase and holding of Fund Shares as a prudent Plan investment. Assets of the Plan were highly concentrated in Rhodia common stock at all relevant times when the stock was selling at above its fair market value, as that term is defined under ERISA and its governing regulations. Such excessive concentration in Rhodia shares was a result of the restrictions on trading Fund Shares which existed for most participants, as well as decisions and actions of defendants described above.

82. As a result of defendants' material misrepresentations and failure to disclose the material facts which they knew or were under a fiduciary obligation to discover regarding the adverse condition of the Company, plaintiffs and the Class were misled and deprived of their opportunity to make an informed judgment as to their investment in Rhodia stock. Had Plan participants been properly and adequately informed about the true financial condition of the Company and given accurate information concerning Rhodia's prospects and associated risks, they would not have purchased and held the Rhodia stock as to which they had discretion during periods in which its cost exceeded its statutorily defined fair market value and would not have sustained the damages they ultimately experienced.

83. As a further result of defendants' material misrepresentations and failures to investigate as described above, they caused the Plan and its Predecessor Plan and individual participants to invest in Rhodia securities at a price in excess of the fair market value of those securities, and with no reasonable probability that those securities would provide a fair return commensurate with the prevailing rate of returns on comparable investments.

84. Upon information and belief and in anticipation of further discovery, at times relevant hereto, despite defendants' knowledge of the Company's true financial condition and the risks associated with investing in Company stock, defendants conducted numerous Company meetings in which they encouraged participants to invest their monies in Rhodia stock. As a result of defendants' failure to timely disclose adverse financial information and the risks associated with investing in Company stock at these meetings, plaintiffs and Class members were deprived of the opportunity to make informed decisions with respect to the investment of their retirement savings.

85. On information and belief and in anticipation of further discovery, defendants have done nothing to remedy the problems caused by the Plan's over-concentration in Rhodia common stock. Defendants' imposition and maintenance of restrictions on the transfer of stock purchased through Company matching contributions has had the effect of depriving plaintiffs and Class members of having the opportunity to exercise full control over their Plan's assets and of forcing them to concentrate their retirement monies in Company stock. This over-concentration in Company stock resulted in substantial retirement fund losses to plaintiffs and Class members. Defendants' actions (or lack thereof) deprived plaintiffs and Class members of the opportunity to exercise control over the Plan's assets because they did not have the opportunity to obtain sufficient information to make informed decisions with regard to

31

investment alternatives available under the Plan, and incidents of ownership appurtenant to such investments.

86.     At all relevant times, defendants deprived all participants of the opportunity to exercise control over their Plan's assets because they did not have the "opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan, and incidents of ownership appurtenant to such investments" pursuant to 29 C.F.R. §2550.404c-1(b)(2)(i)(B).

87.     At all relevant times, plaintiffs and members of the Class did not exercise independent control over the assets in the Plan because defendants subjected plaintiffs and members of the Class to improper influences and/or concealed material facts regarding certain investments. 29 C.F.R. §2550.404c-1(c)(2)(i)-(ii).

88.     For the reasons set forth above, defendants are not relieved of their fiduciary duties to the extent that they might otherwise have been so under ERISA §404(c), 29 U.S.C. §1104(c).

89.     As a result of defendants' failure to act in a prudent manner, in relation to the Plan's investment in Company stock, Company stock constituted a substantial portion of the Plan's assets during the past four years.

90.     Since April 2001, Rhodia common stock has collapsed in value from approximately $12 per share to less than $2 per share.

91.     Accordingly, defendants are not relieved of their fiduciary duties under ERISA, 29 U.S.C. §1104(c).

## DEFENDANTS' BREACHES OF FIDUCIARY DUTY

92. ERISA is a comprehensive statute covering virtually all aspects of employee

benefit plan, including retirement savings plan, such as the Plan and the predecessor plan:

It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA §2(b), 29 U.S.C. §1001(b).

93. Under ERISA, those responsible for plan management and oversight stand in a

fiduciary relationship in relation to plan participants. Pursuant to ERISA, a "fiduciary" is

defined broadly to include all persons or entities that are able to exercise discretionary authority

or control over the management of a plan or its assets.

94. ERISA requires strict fidelity and loyalty in the execution of a plan's management

pursuant to 29 U.S.C. §1002(21). In addition, ERISA imposes on plan management a fiduciary

duty of prudence, requiring those responsible for plan management to "discharge his [or her]

duties with respect to a plan solely in the interest of the participants and their beneficiaries and ...

with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of

an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1). ERISA also

imposes on those responsible for plan management a duty of loyalty, requiring the fiduciary to

"discharge his duties with respect to a plan solely in the interest of the participants and their

beneficiaries and ... for the exclusive purpose of ... providing benefits to the participants and their

beneficiaries." *Id.*

95. Defendants' fiduciary duties of loyalty, due care and prudence include a duty to

timely disclose and inform participants and beneficiaries of any material adverse information

about the Company. When a plan is composed of various investment funds, such as the Rhodia

33

401(k) Plan, this duty to inform and disclose also includes: (a) the duty to impart to the plan's participants material information which the fiduciary knows or should know is sufficient to apprise the average plan participant of the risks associated with investing in any particular investment; and (b) a duty to convey complete and accurate information material to the circumstances of the plan participants and their beneficiaries. The disclosure duties and fiduciary duties imposed on plan management by ERISA were designed to reduce the disparity in access to company information that exists between the fiduciaries and the participants and their beneficiaries.

96. ERISA imposes on plan fiduciaries the duty, *inter alia*, to adhere to the terms of the plan, including those purposes established in the plan document as, in this instance, "to provide ... retirement security for eligible employees."

97. Other duties imposed upon those who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management or disposition of plan assets include, but are not limited to:

(a)     The duty to investigate and evaluate the merits of decisions affecting the use and disposition of plan assets;

(b)     The duty to evaluate all investment decisions with "an eye single" to the interests of plan participants and beneficiaries;

(c)     The duty to avoid placing themselves in a position where their acts as officers, directors or employees of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)     To the extent that a party is responsible for appointing and removing named fiduciaries, the duty to monitor those persons who have been named;

(e)     The duty, if a directed trustee, to act only upon those directions which are consistent with the terms of the plan and with ERISA;

(f)     The duty to disclose and inform of any material adverse information about the company which duty entails among other things: (i) a duty not to make materially false and misleading statements or misinform plan participants about

34

the true financial condition of the company; (ii) an affirmative duty to inform plan participants about material adverse factors which were affecting the company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of plan participants and their beneficiaries; and

(g)     When a plan is composed of various investment funds, such as the Rhodia 401(k) Plan, the duty to inform and disclose also includes the duty to impart to plan participants material information which the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment.

98.     Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan's use of Company stock as a plan investment for, among other reasons, the following:

(a)     The Plan's investment in Rhodia Stock Fund, as a percentage of the Plan's portfolios, was an undiversified investment in a single stock that carried with it an inherently high degree of risk and volatility;

(b)     Defendants failed to timely provide plaintiffs and Class members with complete and accurate information about Rhodia's common stock and the risks associated with individual participants' and the Plan's substantial investment therein;

(c)     Defendants breached their fiduciary duty and their duty to inform and disclose, by encouraging plaintiffs and Class members to continue to make and maintain substantial investments in Rhodia common stock in their Plan accounts; and

(d)     Defendants failed to monitor the prudence of Rhodia stock as an investment alternative for the Plan.

99.     In addition to defendants' duties of loyalty and prudence, the fiduciary duties imposed on defendants by ERISA also entail a duty on the Plan's management to conduct an independent and continuing investigation into the merits of the Plan's investments to ensure that each investment is suitable for the Plan. Defendants breached their fiduciary duties of loyalty and prudence by failing to investigate and monitor the suitability of the Rhodia Stock Fund as an investment option.     Had defendants conducted a reasonable investigation into the Plan's

35

investment in Company stock they would have known that, during the Class Period, Rhodia Stock Fund was not a suitable or prudent investment for the Plan participants.

100.    Defendants' duty of loyalty also entailed a duty to avoid conflicts of interest and to resolve them promptly should they occur. Under ERISA, a fiduciary must always act for the sole benefit of the participants and their beneficiaries. Defendants breached their duty of loyalty by failing to avoid conflicts of interest and to resolve such conflicts promptly when they did occur. Defendants continued to invest the participants' and beneficiaries' monies in Rhodia Stock Fund and imposed restrictions on the sale of such funds despite the unsuitability of such a risky investment. Thus, defendants failed to act to protect plaintiffs' and Class members' interests in the administration of the Plan.

101.    Defendants deprived all participants of the opportunity to exercise control over their Plan assets because they did not have the "opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan, and incidents of ownership appurtenant to such investments" pursuant to 29 C.F.R. §2550.404c-1(b)(2)(i)(B).

102.    For the reasons set forth above, defendants are not relieved of their fiduciary duties to the extent that they might otherwise have been so under ERISA §404(c), 29 U.S.C. §1104(c).

103.    As a result of defendants' breaches of their fiduciary duties owed to plaintiffs and Class members, the Plan suffered substantial losses and plaintiffs and Class members were harmed because, throughout the Class Period, a substantial percentage of the Plan's assets were invested in Rhodia Stock Fund and because the value of Rhodia common stock substantially under-performed the market and other reasonable investment alternatives. Since plaintiffs and Class members did not have independent control over how their assets were ultimately invested, defendants were responsible for ensuring the Plan's investments were and remained prudent.

36

## CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) & (b)(2)-(3) are met with respect to the Class defined below.

105. The Class consists of all participants and beneficiaries of the Plan for whose individual accounts the Plan held shares of Rhodia common stock at any time from January 1, 1999 to the present (the "Class Period"). Excluded from the Class are the Court, the defendants, the officers and directors of Rhodia, members of their immediate families, their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

106. The Class consists of thousands of persons located throughout the United States. Class members are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The exact number and identity of Class members can be determined through discovery.

107. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to Class members which predominate over questions which may affect individual Class members include:

      (a)     Whether ERISA applies to the claims at issue here;

      (b)     Whether defendants owe and owed fiduciary duties to Class members;

      (c)     The nature of the fiduciary duties defendants owed to Class members;

      (d)     Whether defendants breached their fiduciary duties under ERISA;

      (e)     The extent of harm sustained by Class members; and

      (f)     The appropriate measure of relief.

108. Plaintiffs' claims are typical of those of the Class because plaintiffs and Class members suffered similar harm as a result of defendants' unlawful and wrongful conduct.

37

Absent a class action, Class members may not receive restitution or other appropriate relief and will continue to suffer losses, and these violations of law will proceed without remedy.

109.    Plaintiffs are committed to pursuing this action and have retained counsel experienced in class action litigation of this nature. Plaintiffs will fairly and adequately represent the interests of the Class and plaintiffs have no interests which conflict with those of the Class.

110.    The prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for defendants. Individual actions may, as a practical matter, be dispositive of the interests of the Class.

111.    A class action is the superior method for fair and efficient adjudication of this controversy. The likelihood that individual Class members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Plaintiffs' counsel, highly experienced in class actions, see no difficulty in the management of this case as a class action.

## COUNT I

### Breach of Fiduciary Duty Against Defendants

112.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

113.    The Plan is governed by the provisions of ERISA, 29 U.S.C. §§1001, *et seq.*, and plaintiffs and Class members are participants and/or beneficiaries in the Plan. Defendants exercised discretionary authority or control with respect to the management of the Plan and their assets and are fiduciaries or co-fiduciaries to the Plan under the terms of ERISA.

114.    Defendants violated their fiduciary duties of loyalty and prudence by: (a) permitting a significant percentage of the Plan's assets to be invested in Company stock; (b) failing to adequately investigate and monitor the prudence of the Plan's investments in Company stock; (c) failing to take steps to eliminate or reduce the amount of Company stock in the Plan; (d) failing to adhere to the purposes of the Plan insofar as those purposes included *inter alia* the provision of retirement security to eligible employees; and (e) failing to give plaintiffs and Class

38

members adequate information about the composition of the Plan's portfolios and accurate information about Rhodia, its financial prospects and its suitability as a Plan investment.

115.    Defendants also breached their fiduciary obligations by imposing restrictions on plaintiff's and Class members' investments in Company stock and by promoting Rhodia Stock Fund common stock as a prudent Plan investment and encouraging the Plan's participants to invest their retirement savings in Company stock.

116.    At all times relevant to the allegations raised herein, each of the defendants was a co-fiduciary of the others. Defendants participated in the fiduciary breaches described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA and/or had knowledge of the breaches of its co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

117.    As a result of defendants' breaches of fiduciary duties, plaintiffs and Class members, as well as the Plan, suffered losses, the exact amount of which will be determined at trial. Defendants are personally liable to plaintiffs and Class members for these losses.

## COUNT II

### Breach of Fiduciary Duty Against Defendant Fidelity Management Trust Company

118.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

119.    Defendant Fidelity breached its duties of loyalty and prudence by: (a) failing to reduce the concentration of Rhodia common stock held in the Plan when it was prudent to do so; (b) failing to sell Rhodia common stock shares held by the Plan when it would have been prudent to do so; (c) failing to provide plaintiffs and Class members with adequate information about the composition of the Plan's portfolios and accurate information about Rhodia, its financial prospects and its suitability as a Plan investment; and (d) failing to take any action on behalf of Plan participants and beneficiaries after it was on notice that the stock values in accounts were overstated.

39

120. Defendant Fidelity knowingly participated in the fiduciary breaches of its co-fiduciaries, enabled its co-fiduciary to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA, and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

121. As a result of Fidelity's breaches of fiduciary duty, plaintiffs and Class members, as well as the Plan, suffered losses, the exact amount of which will be determined at trial. Defendant Fidelity is personally liable to plaintiffs and Class members for those losses.

## COUNT III

### Breach of Fiduciary Duty–ERISA Disclosure Requirements against Defendants

122. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

123. Defendants failed to advise plaintiffs and Class members that their investments in the Plan was at substantial risk as a result of the concentration of Rhodia stock as a percentage of the Plan's total assets. Defendants also failed to provide plaintiffs and Class members with accurate information about the Company's current and future financial prospects.

124. Because of the disparity in knowledge between defendants and plaintiffs and Class members, plaintiffs and Class members relied on defendants to provide them with accurate and sufficient information about Rhodia and the Plan's investment therein, which was material to the suitability of Company stock as a prudent investment option.

125. By failing to timely convey complete and accurate information to plaintiffs and Class members, defendants violated their fiduciary duty to disclose sufficient information to inform plaintiffs and Class members of the risks associated with investment in Company stock when defendants should have known that the failure to disclose such material information would result in losses to plaintiffs and Class members.

40

126.    As a result of defendants' failure to disclose and inform, plaintiffs and Class members suffered losses, the exact amount of which will be determined at trial. Defendants are personally liable to plaintiffs and Class members for these losses.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Determining that this is a proper class action to be certified under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that defendants have violated the duties, responsibilities and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure requirements as described above;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure;

D.    Awarding plaintiffs, Class members and the Plan restitution and/or remedial relief;

E.    Awarding plaintiffs, Class members and the Plan pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs; and

F.    Awarding such other relief as this Court may deem just and proper.

DATED: August 3, 2006

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK

JEFFREY P. FINK (JF-1893)

610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3990

LAW OFFICE OF MALLISON & MARTINEZ
STAN S. MALLISON
HECTOR R. MARTINEZ

41

1042 Brown Ave., Suite A
Lafayette, CA 94549
Telephone: 925/283-3842
Facsimile: 925/283-3426

Co-Lead Counsel for Plaintiffs

KLEEBLATT, GALLER, ABRAMSON
 & ZAKIM LLC
RICHARD P. GALLER
IAN S. KLEEBLATT
25 Main Street
Hackensack, NJ 07601
Telephone: 201/342-1800
Facsimile: 201/342-1848

Liaison Counsel for Plaintiffs